IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE AUSTIN PETERS,<br><br>           Petitioner,<br><br>vs.<br><br>ERIC ARNOLD, Warden, California State Prison, Solano,<br><br>           Respondent. | No. 2:15-cv-00586-JKS<br><br>MEMORANDUM DECISION |

Shane Austin Peters, a state prisoner represented by counsel, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Peters is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at California State

Prison, Solano. Respondent has answered, and Peters has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On August 10, 2010, Peters and co-defendant Dale Joseph Evert Coley were charged

with the murder of Emmanuel Hernandez and with the attempted murder of Yusuf Hussein. The

information alleged that both Peters and Coley had committed the crimes by firing a gun from a

motor vehicle with the intent to kill and committed the murder while actively participating in a

criminal street gang and to further the activities of the gang. The information further contained

various firearm enhancement allegations. On direct appeal of his conviction, the California

Court of Appeal laid out the following facts underlying Peter's case:

> On the evening of January 28, 2009, 15–year–old Emmanuel Hernandez was
> walking along Sonoma Boulevard in Vallejo with his friend Yusef Hussein and some
> other people. Hussein and Hernandez separated from the others and continued walking.
> At about 8:15 p.m., after they passed an auto parts store, Hussein heard a series of
> gunshots and ran, diving over a guardrail. When he rose from the ground uninjured, he

found Hernandez bleeding and slumped over the rail. An officer who was patrolling nearby had heard a rapid succession of gunshots and responded to find Hernandez bleeding from his throat and mouth. Hernandez had been shot in the back of his neck and later died of his wound.

Eight expelled bullet casings from a nine-millimeter semiautomatic handgun were found in the street at the site of the shooting. A neighbor in the area who looked out his window immediately after hearing the shots saw a small green car leaving the area of the shooting. A video tape from the auto parts store's surveillance camera showed that at about the time of the shooting, two people were walking on the sidewalk. It also showed that a vehicle, which could not be identified, stopped at and then ran a red light at the intersection of Sonoma Boulevard and Nebraska Street.

Hussein told police that he had seen a green car and recognized the driver. He did not initially identify appellant Coley when he was shown photographic lineups containing Coley's picture. After a detective angrily confronted Hussein about a photo of Coley from the "My Space" website that had been circulated as a "wanted poster" seeking the driver of the car involved in the Hernandez shooting, Hussein identified Coley from a photocopy of his driver's license. Hussein wrote "NVS" on the driver's license picture. Hussein had been in schoolyard fights with "[t]he Norteno," gang and people could have perceived him as a member or associate of the rival Sureno gang at the time.[FN3]

> FN3. When he testified at trial, Hussein denied that he and Hernandez were gang members, but he allowed that some people might think they were. He claimed he did not see or hear a car before or after the shooting and never saw the driver. He acknowledged he was scared to testify.

Appellants Coley and Peters were charged with the first degree murder of Hernandez and the attempted murder of Hussein. (Pen.Code, § 187, 664/187.) The murder charge was accompanied by special circumstance allegations that the killing was gang-related and was perpetrated from a vehicle, and both counts included firearm and gang allegations. (§§ 190.2, subds.(a)(21) & (a)(22), 12022.53, subds. (b), (c), (d) & (e)(1); 12022.5, subd. (a)(1), 186.22, subds. (b)(1), (f).) Appellants were jointly tried before a jury.

At the trial, the description of the shooting came primarily from Richard Eads and Francisco Soto, who were originally charged with the murder but agreed to cooperate with the investigation in exchange for the opportunity to plead guilty to the lesser crime of accessory after the fact. Both identified Coley and Peters as friends, and testified that the were in Coley's car with Coley, Peters, and (according to Eads) Alonzo Wilson when the shooting took place. DNA evidence consistent with both Eads and Soto was in fact found in Coley's car.

According to Eads, he saw Coley and Peters almost every day. He had heard both of them refer to a gang called "NVS," which stood for North Vallejo Savages and was a Norteno gang. Coley's gang moniker was "Slumpa" and Peters's was "Frosty." Eads had been with Coley and Peters when they drove around flashing gang signs and yelling

at rival gang members, an activity they called "scrap hunting," "scrap" being a derogatory term that Nortenos used to refer to Surenos. On one of these "hunts," Eads saw Peters fire a gun in the air when they came across a group of Surenos.

On the day Hernandez was shot, Coley, Peters, Eads and Soto had been hanging out together with Alonzo Wilson, smoking marijuana. In the early evening, Eads, Coley and Wilson went to a Wal–Mart with a young woman to buy spray paint.[FN4] Coley, Peters, Eads, Soto and Wilson began driving around in Coley's car, stopping to spray paint anti-Sureno graffiti. They drove to a park in West Vallejo, where they knew Sureno gang members were likely to be present. Coley was driving and Peters was sitting in the front passenger seat, with the others sitting in the back seat.

> FN4. Coley, Eads, Wilson and a young woman were captured on a Wal–Mart video camera buying spray paint at about 6:45 p.m.

While driving down Sonoma Boulevard, Peters and Coley noted a "rival gang member" named "Yusef" (Hussein) walking down the sidewalk with some other people. Coley said something to the effect of, "I can't believe he [is] walking around on my streets." Eads knew that Hussein was a rival gang member from his name. Coley drove Peters to his car, where Peters retrieved something, and they drove back to the area where they had seen Hussein. When they spotted him again, Coley slowed down and Peters got out of the car, but he returned without doing anything. Coley made a U-turn, ran a red light at the intersection of Sonoma Boulevard and Nebraska Street and crossed over onto the opposite side of the street to get closer to Hussein. Peters leaned out the open passenger side window, sat on the door frame (where the window rolled up and down) with his feet on the passenger seat, and Eads heard several shots. As they drove away, Eads saw a person kneeling down with his hand on the cement like he was trying to hold himself up.

The group returned to Coley's house, where they searched the car for bullet shells. They drove back to Peters's car, and Eads and Peters drove together to Eads's house. Eads heard Peters speaking on his phone saying "shots, fired, shots fired." He also said, "I got my stripes now," or "I'm definitely getting my stripes now." Peters later told Eads he had gotten rid of the gun used in the shooting and that Emmanuel Hernandez, the person who was killed, was a Sureno gang member known as "Little Creeps." Sometime after the shooting, Peters told Eads that he and Coley had had an encounter with a rival gang member in which he yelled, "Rest in piss, Little Creeps" out the car window.

Soto described the shooting in much the same way. He testified that after a day of smoking marijuana, Coley, Peters, Eads and Soto were driving around in Coley's car, with Coley driving and Peters in the front passenger seat. While on Sonoma Boulevard, they saw a BBH (Brown Brotherhood) Sureno gang member who Peters identified as "Yusef" (Hussein) walking down the street. Peters told Coley that Hussein was a rival gang member and Coley pulled off on one of the side streets. Peters got out of the car and walked toward Hussein with a gun in his hand, but then returned to the car.[FN5] Coley started driving again and Peters leaned out the passenger side window, sat on the door

frame, and fired some shots. They drove to Coley's house and searched the car for shells. Soto heard Peters say, "We just laid him down."

FN5.    Soto thought the gun was a revolver.

Records of Peters's cell phone usage show that on the afternoon and evening of the shooting, whoever was using that phone was moving around the City of Vallejo. At 4:40 p.m. a call was placed from Peters's' cell phone from a location in Vallejo to his mother's telephone. Four more calls were made from his phone in Vallejo that evening, and incoming calls to his phone went unanswered between 8:00 p.m. and 8:13 p.m. At 8:23 p.m., there was a call from Peters's phone to his home number, and at 8:26 p.m., Peters's phone received a call from his mother's cell phone. A call from Peter's cell phone back to his mother's number connected at 8:28 p.m.

A text message sent by Peters' cell phone about three hours after the shooting stated, "im sellin dat ruger." The following text messages were exchanged between Coley's telephone number and Peters's later that same night: "U home?"  "Yup was dat shit on the news."  "I didn't c it bt I missed half of it."  "Yup, I ain't heard nutin eitha." In the days following the shooting a text exchange between Peters's phone and another number appeared to refer to the trade or sale of a handgun, which is sometimes referred to in street parlance as a "thang": "[Other number]: You grimy u hit dat nigga an den trade me dat thang is hot u shadey.  [Peters's phone]: Don't tex me at work  [Other number]: Cus what u mean [Peters's phone]: It ain't hot bruh don't text shit like dat cuz da fed."

Detective Tribble of the Vallejo Police Department had been assigned to the FBI Solano County violent gang task force and had monitored gang activity within Solano County since October 2007. He had testified as a gang expert on 25 occasions and was familiar with the Norteno and Sureno gangs. The "primary activities" of the Nortenos include criminal activities such as murder, robbery, assault with a deadly weapon, drug sales, witness intimidation, firearm possession and shooting from a vehicle. Tribble arrested Norteno member Randy Valencia in 2006, who was convicted of assault with a firearm, and Norteno member Dominic Tenorio in 2007, who was convicted of robbery.

According to Detective Tribble, various subsets of the Nortenos operate in Vallejo, one of which is the North Vallejo Savages or NVS. NVS and other subsets operate under the umbrella of the larger Nortenos organization, engage in some common criminal activities, and are all enemies of the Sureno gang. NVS had about seven to 10 members, associated itself with the color red and the number 14 (Norteno symbols) and operated throughout the city of Vallejo. Tribble had first seen graffiti bearing the initials "NVS" in 2008; a fellow officer told him it was a new subset of Nortenos that had emerged within the past year or so.

In Tribble's opinion, appellant Coley was a member of NVS, a subset of the Nortenos. He based this opinion on Coley's association with Peters, Eads, Soto, and other Norteno members; his possession of rap lyrics that appeared to be gang writings; and photos showing him throwing gang signs and wearing red clothing that appeared to be gang attire. Tribble believed appellant Peters was also a member of NVS because he

associated with Norteno/NVS members, wore gang clothing and had a gang moniker of "Frosty." In 2010, after the shooting in this case, NVS member Roy Brown was arrested for a crime involving a gun. Both appellants associated with Brown.

Appellant Peters offered an alibi defense at trial, with his mother, uncle, sister and a neighbor testifying that he was at his mother's home on the night of the shooting. To explain various references to NVS, he presented the testimony of friends who reported that he used a laptop in Coley's garage to create songs and referred to the garage as NVS Studios, short for North Vallejo Studios. Peters also presented the testimony of two homeless men who were living close to the scene of the shooting. One of them claimed not to have heard any vehicles when the shots were fired. The other testified that he heard people yelling profanities in Spanish and saw a man walking fast and holding a weapon after the shooting; he described the man as 6 feet 3 inches, stocky, with his face hidden by a hood.

The murder weapon was never found, although a different semiautomatic handgun was seized by police when they arrested Coley and searched his home. No gunshot residue was found in Coley's car.

The jury convicted Coley and Peters of second degree murder and attempted murder. As to Coley, the jurors returned true findings on the gang allegations under section 186.22, subdivision (b) that were attached to each count, as well as the firearm enhancement that was alleged as to the murder count under section 12022.53, subdivisions (d) and (e)(1). As to Peters, the jury found true the gang allegations under section 186.22, subdivision (b), but was unable to reach a verdict on the allegations that he had personally discharged a firearm causing great bodily injury or death under section 12022.53.

The court sentenced Coley to prison for 15 years to life on the murder count plus 25 years to life for the firearm enhancement, for a total term of 40 years to life, with a concurrent sentence on the attempted murder count. Peters was sentenced to 15 years to life on the murder count and was ordered to serve a consecutive nine-year upper term on the attempted murder count, plus an additional 10 years for the gang enhancement attached to the attempted murder count, for a total term of 19 years plus 15 years to life.

*People v. Peters*, Nos. A131097 & A132226, 2013 WL 56988, at *1-4 (Cal. Ct. App. Jan. 4, 2013).

Through counsel, Peters appealed his conviction, arguing that: 1) there was insufficient evidence to support the jury's finding that the North Vallejo Savages are connected to the Nortenos or that the Nortenos are a criminal street gang; 2) California Penal Code § 654[1] barred

---

[1]     Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that

multiple punishment for the gang enhancement; 3) Peters' right to confrontation was violated when the trial court refused to order the prosecution to disclose the identity of the informants who provided information upon which the gang expert relied; and 4) the trial court abused its discretion in denying Peters' motion to disclose juror information. Peters also concurrently filed a counseled petition for a writ of habeas corpus in the Court of Appeal, in which he alleged that: 1) he was convicted based upon false evidence; 2) newly-discovered evidence undermined the prosecution's case and pointed to Peters' innocence; and, 3) if the evidence could have been discovered prior to trial, counsel's failure to do so constituted ineffective assistance of counsel.

On January 4, 2013, the Court of Appeal issued a reasoned, unpublished opinion unanimously affirming the judgment against Peters in its entirety. *Peters*, 2013 WL 56988, at *14.[2] On the same date, the Court of Appeal issued an order to show cause returnable in the superior court with respect to the counseled habeas petition. Peters petitioned for review in the California Supreme Court of the claims he unsuccessfully raised on direct appeal. The Supreme Court summarily denied review on April 10, 2013. On May 13, 2014, the Superior Court denied Peters' habeas petition in a reasoned, unpublished decision concluding that Peters failed to present credible evidence in support of his false evidence and newly-discovered evidence claims. The record before this Court does not indicate that Peters appealed the denial of his state habeas petition.

---

provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." CAL. PENAL CODE § 654.

[2]     The appellate court likewise affirmed Coley's judgment. *Peters*, 2013 WL 56988, at *14.

Peters timely filed a counseled Petition for a Writ of Habeas Corpus to this Court on March 16, 2015.[3] *See* 28 U.S.C. § 2244(d)(1)(A).  After the parties completed briefing in this case, the California Supreme Court decided *People v. Sanchez*, 374 P.3d 320, 327-28 (Cal. 2016), in which it held that a gang expert may testify about his general knowledge but not about case-specific facts of which he has no personal knowledge.  The California Supreme Court determined that such statements violate the Confrontation Clause if the hearsay is testimonial, unless there is a showing of unavailability and the defendant had a prior opportunity for cross-examination or forfeited that right by wrongdoing.  *Id.* at 324.  The Court issued an order requiring the parties to brief *Sanchez*'s impact, if any, on this case and for Respondent to lodge transcripts of two in camera hearings held in California Superior Court on Peters' motion to disclose the identities of the informants.  Docket No. 20.  The parties have complied, and the matter is now ripe for adjudication.

## II. GROUNDS RAISED

In his counseled Petition before this Court, Peters raises the three grounds for relief he unsuccessfully raised to the state courts on direct appeal.  First, he argues that there was insufficient evidence to sustain the jury's true finding on the gang allegation under Penal Code § 186.22(b)(1).  He additionally contends that the trial court violated his right to confrontation by admitting gang expert testimony based in part on information from undisclosed informants.

---

[3]     Co-defendant Coley filed a petition for federal habeas relief on May 20, 2016, nearly one year after the expiration of the limitations period set forth in 28 U.S.C. § 2244(d)(1)(A), and it was denied on that basis.  *See* Docket Nos. 15, 16, *Coley v. Ducart*, No. 2:16-cv-01168-MCE-AC (E.D. Cal.); *Coley v. Ducart*, No. 16-cv-01168, 2017 WL 714304, at *9 (E.D. Cal. Feb. 23, 2017).  The Ninth Circuit Court of Appeals declined to grant Coley a certificate of appealability.  *Coley v. Ducart*, No. 17-15623, 2017 WL 4740616, at *1 (9th Cir. Sept. 22, 2017).

Finally, Peters claims in Ground 3 that the trial court erred in denying his motion to release juror information.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Ground 1.        <u>Sufficiency of the Evidence Supporting the Gang Allegations</u>

Peters first argues that the prosecution presented insufficient evidence to support that the North Vallejo Savages were a subset of the larger criminal organization known as the Nortenos, or that the Nortenos are a criminal street gang.[4] As articulated by the Supreme Court in *Jackson*,

---

[4]        Notably, Peters does not contest the underlying crimes; he only challenges the true findings on the street gang enhancements.

the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review. *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005). A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam); *see West v. AT&T*, 311 U.S. 223, 236

(1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

Peters argues here, as he did on direct appeal, that the prosecution failed to prove the existence of a criminal street gang. A "criminal street gang" means "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." CAL. PENAL CODE § 186.22(f). To prove that Nortenos is a "criminal street gang," the prosecution was required to establish that the gang is an ongoing association of at least three people with a common name or identifying sign or symbol, which "has as one of its primary activities the commission of one or more of the criminal acts" enumerated in Penal Code § 186.22(e), and whose members, individually or collectively, "have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting" at least two predicate offenses within the statutory period. *People v. Hernandez*, 94 P.3d 1080, 1085 (Cal. 2004).

Here, the majority of evidence that Peters' acts were gang-related and thus were subject to the gang enhancement were provided by a gang expert. The Court of Appeal described the expert's testimony as follows:

> Detective Tribble, a qualified gang expert, testified that the Nortenos were one of three main Hispanic street gangs in the state, the others being the Surenos and Brown Pride. The Nortenos identified with common signs and symbols such as the number 14 and the color red, and were rivals and enemies of the Sureno gang. Norteno gang members thrived on fear and intimidation and members earned status within the gang by "putting in work" or committing criminal acts that promoted their gang and their status in

11

the gang community.  A primary activity of the Nortenos was the commission of violent crimes such as murder, robbery, assault with a deadly weapon, witness intimidation, firearm possession, shooting from a vehicle, and drug sales.  Given this evidence, the Nortenos clearly qualified as a criminal street gang under section 186.22.

*Peters*, 2013 WL 56988, at *5.

Under both California and federal law, an expert may offer opinion testimony to assist the trier of fact in understanding certain evidence or determining certain issues.  *See* CAL. EVID. CODE § 801(a); FED. R. EVID. 702.  In both California and federal courts, gang culture has been considered an appropriate subject for expert testimony.  *See, e.g.*, *United States v. Padilla*, 387 F.3d 1087, 1094 (9th Cir. 2004) (allowing exert testimony concerning gang punishment for junior members who fail to support senior members); *In re Frank S.*, 46 Cal. Rptr. 3d 839, 842 (Cal. Ct. App. 2006) ("It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation."); Detective Tribble's testimony falls within the recognized scope of permissible expert testimony as to gang culture, habits, and motivation.

Peters nonetheless argues that the jury was required to find that the North Vallejo Savages  and not just the Nortenos qualified as a criminal street gang.  But as he acknowledges, the Court of Appeal rejected that contention on direct appeal by citation to California law that "[e]vidence of gang activity and culture need not be specific to a particular local street gang, but may be based on a larger organization."  *See Peters*, 2013 WL 56988, at *5 (citing *People v. Williams*, 86 Cal. Rptr. 3d 130, 134 (Cal. Ct. App. 2008)).  This Court is bound by the state court's ruling that, under California law, the jury could find that the North Vallejo Savages are a criminal street gang based on its affiliation with the larger Norteno criminal street gang.  *See Emery v. Clark*, 643 F.3d 1210, 1215-16 (9th Cir. 2011) (per curiam) (overruling prior Ninth

Circuit precedent interpreting the gang enhancements in the California Penal Code and recognizing "the California Supreme Court's authoritative interpretation").

Peters likewise claims that there was insufficient evidence of the "primary activities" element. The gang enhancement statute enumerates a number of offenses which may be used to establish a "pattern of criminal gang activity" that is "one of its primary activities." *See* CAL. PENAL CODE § 186.22(f). Here, "Detective Tribble testified that he had worked as a gang investigator for the City of Vallejo, was cross-designated as a federal officer with the Solano County violent gang task force, had received extensive specialized training in gangs, had met with gang investigators from different jurisdictions, had made daily contact with gang members, had personally investigated over 100 gang crimes, and had qualified as a gang expert on 25 previous occasions, five of which involved Norteno gangs." *Peters*, 2013 WL 56988, at *6. California law provides that the prosecution may rely on a properly qualified gang expert's testimony or "evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute" to establish the primary activities element. *People v. Sengpadychith*, 27 P.3d 739, 744 (Cal. 2001). Peters did not challenge Detective Tribble's qualifications as an expert on direct appeal, and the record fully supports that Detective Tribble was so qualified. Nor does Peters challenge the accuracy of the documented evidence of other members' convictions. Accordingly, a rational factfinder could draw from Detective Tribble's testimony and the documented evidence of other convictions the inference that one of the Norteno gang's "primary activities" is the commission of predicate offenses. CAL. PENAL CODE § 186.22(f).

Similarly, Peters argues that the prosecution provided insufficient evidence that the North Vallejo Savages are a subset of the Nortenos or that the Nortenos had three or more members. But as the Court of Appeal concluded, Detective Tribble's testimony provided sufficient information for the jury to reasonably draw such conclusions:

> Detective Tribble, a qualified gang expert, testified that the Nortenos were one of three main Hispanic street gangs in the state, the others being the Surenos and Brown Pride. The Nortenos identified with common signs and symbols such as the number 14 and the color red, and were rivals and enemies of the Sureno gang. Norteno gang members thrived on fear and intimidation and members earned status within the gang by "putting in work" or committing criminal acts that promoted their gang and their status in the gang community. A primary activity of the Nortenos was the commission of violent crimes such as murder, robbery, assault with a deadly weapon, witness intimidation, firearm possession, shooting from a vehicle, and drug sales. Given this evidence, the Nortenos clearly qualified as a criminal street gang under section 186.22.

*Peters*, 2013 WL 56988, at *5.

Peters is not entitled to relief on any argument advanced in support of Ground 1.[5]

---

[5]     After Peters filed his Petition and Respondent answered, the California Supreme Court decided *People v. Prunty*, 355 P.3d 480, 483 (Cal. 2015), holding that the prosecution is required "to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang." In that case, the Supreme Court determined that the prosecution had failed to introduce specific evidence showing that certain subsets of the Norteno gang identified with the larger Norteno group, or that the Norteno subsets shared a connection with each other, or any other Norteno-identified subset, such that one subset's activities could be imputed to another subset. *Id.* at 484. In his Traverse, which was filed 3 days after *Prunty* was issued, Peters argues that his gang enhancement conviction violates *Prunty* because "the prosecution failed to even attempt to prove collaborative activities or collective organizational structure between the NVS subset and the larger Norteno group." Docket No. 15-1 at 14. *Prunty* is not applicable here, however, because "the State's expert testified that [NVS] descended directly from [Nortenos]. In that respect this case is unlike *Prunty*, where the State sought to deem one gang a 'criminal street gang' by introducing evidence of predicate acts committed by gang subsets whose relationship to the gang was unproven." *Johnson v. Madden*, 653 F. App'x 518, 520 (9th Cir. 2016). Tribble's opinion that the NVS descended from the Nortenos appears to come from his discussions with gang members, victims, and other criminal investigators as well as his own research, which appears to satisfy *Prunty*. The Court, however, offers no opinion as to the likelihood of success in the event Peters sought relief in California state court on the basis of *Prunty*.

Ground 2.    Denial of Disclosure of Informants' Identity

Peters next contends that the trial court violated his rights to confrontation, a fair trial,

and due process by admitting gang expert testimony that was based in part on information from

undisclosed informants.  On direct appeal, the Court of Appeal laid out the following factual

background to this claim:

> In forming his opinions regarding gang activities in Vallejo, Detective Tribble
> relied in part on information provided by five confidential informants who were gang
> members or associates in the Vallejo area.  At the preliminary hearing and in a set of
> notes provided to the defense, Tribble described the informants as follows: (1) a person
> who claimed association with members of the Central Valley Clique and the Barrio
> Central Vallejo (two Norteno subsets in Vallejo), and who knew that appellant Peters and
> Jeremy Molina (known as "Worm") were founders of NVS and that NVS sold drugs;
> (2) three Sureno gang members who had no information about who started NVS or its
> membership, but who knew that NVS stood for North Vallejo Savages and that NVS
> interacted with CVC (Centro Vallejo Clique); and (3) a validated member of BBH
> (Brown Brotherhood), a Sureno subset, who told Tribble he went to school with an NVS
> member known as "Worm."  None of the five informants were percipient witnesses to the
> charged crimes or had spoken to appellants.
>     After cross-examining Detective Tribble at the preliminary hearing, appellants
> asked the court to order the disclosure of the informants' identities.  Tribble asserted that
> their identifying information was privileged under Evidence Code sections 1040 through
> 1042.  The court conducted an in camera hearing on the issue, pursuant to Evidence Code
> section 1042, subdivision (d), and denied the request for disclosure.
>     Before trial commenced, appellants brought motions to disclose the identities of
> these informants under Evidence Code section 1042, subdivision (d).  Appellant Peters
> also filed a motion in limine seeking the same information, or, alternatively, an order
> precluding expert testimony that was based on information provided by the informants.
> After conducting a second in camera hearing on the issue, the court ordered the
> prosecution to disclose a redacted gang debriefing form filled out by the first informant,
> but ordered that the informants' identities would remain confidential.  The court indicted
> that Detective Tribble could base his expert opinion on information provided by the
> informants, but could not convey the details of what they had told him on
> cross-examination.  It observed that while the identities of the informants had not been
> disclosed, appellants knew the substance of the information they provided from the
> cross-examination of Detective Tribble at the preliminary hearing.  The court
> admonished the jury to consider the out-of-court statements of other people to Detective
> Tribble as an explanation for his expert opinion, but not for the truth of those statements.

*Peters*, 2013 WL 56988, at *7.

The government has a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59 (1957).[6] The privilege is not, however, absolute; it is limited by "the fundamental requirements of fairness." *Id.* at 60. Whether disclosure of a confidential informant's identity is justifiable is determined by balancing the public interest in protecting the flow of information to law enforcement against the individual's right to prepare a defense:

> Whether a proper balance renders nondisclosure erroneous must depend upon the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 62.

In this case, because, as the Court of Appeal recognized, none of the informants were percipient witnesses or had information about the shooting or that could exonerate Peters, the disclosure of the informants' identities was not relevant or helpful to Peters' defense or essential to a fair trial under the *Roviaro* guidelines. *Id.* at 64 (requiring disclosure where informant was "the sole participant, other than the accused, in the transaction[s] charged [and] the only witness

---

[6] Although *Roviaro* was not decided "on the basis of constitutional claims," the Supreme Court has stated that its subsequent affirmation in *McCray v. Illinois*, 356 U.S. 300 (1967), which included constitutional claims, suggests that "*Roviaro* would not have been decided differently" if constitutional claims had been presented to the Supreme Court. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 870 (1982). Numerous courts have thus concluded that the *Roviaro* disclosure test is clearly established law for purposes of 28 U.S.C. § 2254(d). *See Carpenter v. Lock*, 257 F.3d 775, 779 (8th Cir. 2001); *Airy v. Chappell*, No. 11-cv-01007, 2014 WL 1266153 (N.D. Cal. Mar. 24, 2014); *see also Fairchild v. Wright*, 362 F. App'x 851, 852 (9th Cir. 2010) (applying *Roviaro* in context of § 2254 petition alleging that prisoner was denied due process by the state court's denial of request for disclosure of confidential informants' identities).

who could amplify or contradict the testimony of government witnessess").  Peters nonetheless argues that disclosure was necessary here to protect his right to confront the witnesses against him.

The Confrontation Clause of the Sixth Amendment mandates that a criminal defendant has the right to confront and cross-examine the witnesses against him.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  This generally means that out-of-court testimonial statements by a witness are not admissible against a defendant unless the witness is available for cross-examination at trial or the defendant had an opportunity to cross-examine the witness about the statements before trial.  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  However, the Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'"  *Id*. at 51 (citation omitted); *Davis v. Washington*, 547 U.S. 813, 823–24 (2006).  "'Testimony,' in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Crawford*, 541 U.S. at 51 (citation and some internal punctuation omitted); *Davis*, 547 U.S. at 824.  As the *Davis* court explained:

> [a] critical portion of [*Crawford*'s] holding . . . is the phrase "testimonial statements."  Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause.  It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

*Davis*, 547 U.S. at 821 (citation omitted).  Thus, nontestimonial statements do not implicate the Confrontation Clause.  *Giles v. California*, 554 U.S. 353, 376 (2008); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007).  The Supreme Court in *Crawford* did not "spell out a comprehensive definition of 'testimonial,' "but it indicated that testimonial evidence includes, among other

things, "police interrogations." *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 1148 (2011)

(quoting *Crawford*, 541 U.S. at 68).

Here, Peters did not have an opportunity to cross-examine the confidential informants,

and there is no evidence the informants were unavailable. Under *Crawford*, Detective Tribble's

testimony violated the Confrontation Clause if it conveyed out-of-court statements offered to

prove the truth of the matter asserted, 541 U.S. at 59 n. 9, and if those statements were

testimonial, *id.* at 51, 68; *see also Davis*, 547 U.S. 813, 824-25 (2006). In considering these

questions, the Court of Appeal concluded:

> Detective Tribble did not relay statements by any of the five informants to the jury. And, even if such statements could be implied from the content of his opinion, it appears that most of them would not qualify as "testimonial." Though statements were made by gang members to the detective, our review of his testimony at the in camera hearings suggests that only one informant provided statements during the course of an (unrelated) formal investigation, as opposed to an informal interview.
>
> To the extent Detective Tribble might have considered testimonial statements by the informants in forming his opinion, the confrontation clause is not implicated because those statements were not offered for their truth. "'*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. *Crawford* itself states that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."'" (*People v. Ramirez* (2007) 153 Cal. App. 4th 1422, 1427, citing *People v. Thomas* (2005) 130 Cal. App. 4th 1202, 1210; *see also People v. Sisneros* (2009) 174 Cal. App. 4th 142, 153–154.) The limiting instruction given in this case directed the jury to consider the statements relayed by Tribble as a basis for his opinion, and not for their truth.[FN7]

> FN7. In *People v. Hill* (2011) 191 Cal. App. 4th 1104, 1127–1131 (*Hill*), a different panel of this court critiqued the distinction made in *Thomas*, *supra*, 130 Cal. App. 4th 1202 between out-of-court statements offered for their truth and those relied upon by an expert as the basis for his or her opinion. The panel noted that "where basis evidence constitutes an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the

expert's opinion." (*Hill*, at p. 1131.) *Hill* concluded, nonetheless, that the distinction between basis evidence and substantive evidence was dictated by *Gardeley*, *supra*, 14 Cal. 4th 605 and other Supreme Court precedents. (*Hill*, at p. 1127, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal. 2d 450, 455.) It therefore rejected the defendant's claim that the gang expert should not have been permitted to describe the out-of-court statements supporting his opinion during his testimony before the jury. (*Hill*, at pp. 1127–1128.) We likewise follow *Gardeley*[7] and apply its

---

[7]     In rendering its opinion in Peters' case, the state court relied in part on *People v. Gardeley*, 927 P.2d 713 (Cal. 1996), which the California Supreme Court has subsequently disapproved, *People v. Sanchez*, 374 P.3d 320 (Cal. 2016). In *Sanchez*, the California Supreme Court held that a gang expert may testify about his general knowledge but not about case-specific facts of which he has no personal knowledge. 374 P.3d at 327-28. It determined that such statements violate the Confrontation Clause if the hearsay is testimonial, unless there is a showing of unavailability and the defendant had a prior opportunity for cross-examination or forfeited that right by wrongdoing. *Id.* at 334-35 ("In sum, we adopt the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.").

As previously-mentioned, the Court ordered both parties to submit supplemental briefing on the applicability, if any, of *Sanchez*. After considering that briefing and other relevant authority, the Court concludes that *Sanchez* does not establish a right to federal habeas relief here. First, the California Supreme Court's determination of federal constitutional law does not constitute "clearly established Federal law, as determined by the Supreme Court of the United States" and is not binding on this Court. *See Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004) ("Although lower federal court and state court precedent may be relevant when that precedent illuminates the application of clearly established federal law as determined by the United States Supreme Court, if it does not do so, it is of no moment."); *Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002) ("[D]ecisions of [the United States Supreme] Court are the only ones that can form the basis justifying habeas relief . . . ."). Further, even assuming that *Sanchez* is binding on this Court, it is nonetheless distinguishable from the facts of this case because, unlike in *Sanchez*, Detective Tribble did not relay case-specific facts or statements by any of the five informants and most of the information from the informants, which consisted of background and not case-specific information, was not obtained in a testimonial setting. *See Peters*, 2013 WL 56988, at *9. Indeed, California courts have since interpreted *Sanchez* to bar expert-witness testimony only if it relates "to the particular events and participants alleged to have been involved in the case being tried." *See, e.g.*, *People v. Vega-Robles*, 224 Cal. Rptr. 3d 19, 43 (Cal. Ct. App. Mar. 7, 2017) (no *Sanchez* error in admitting gang-expert testimony about gang's history and founding because it constituted background information and not case-specific facts barred by hearsay rule).

The Court offers no opinion on the likely outcome of any state action Peters might pursue in light of *Sanchez*.

distinction between basis evidence and hearsay evidence offered for its truth.

Nor do we agree that appellants were deprived of their rights under the confrontation clause as a result of the "limitation" placed on their cross-examination of Detective Tribble. As a result of the court's ruling on the motion to disclose the informants' identities, the statements made by those informants were not conveyed to the jury by the detective during direct examination. But the court specifically stated, "[T]he defendants are free to cross-examine him about that, so then that puts the ball back in your court as to whether or not you wish to cross-examine him about that information . . . ." Thus, the only restriction placed on the appellants' cross-examination was their ability to elicit information identifying the five informants. This restriction, which was authorized under this state's evidentiary law regarding confidential informants, did not amount to a violation of the federal Constitution. (*See People v. Montgomery* (1988) 205 Cal. App. 3d 1011, 1018.)

*Peters*, 2013 WL 56988, at *9.

Under California law, "police officers testifying as gang experts" may properly base "their testimony on personal observations of and discussions with gang members as well as information from other officers and the department's files." *People v. Olguin*, 37 Cal. Rptr. 2d 596, 602 (Cal. Ct. App. 1994) (internal quotation marks omitted), *overruled on other grounds in People v. Cromer*, 15 P.3d 243, 250 n.3 (Cal. 2001); *see also People v. Gonzalez*, 135 P.3d 649, 656 (Cal. 2006) (gang expert opinion may be based on citizen informants, police reports and gang member contacts because these are reliable bases for opinion); *People v. Hill*, 120 Cal. Rptr. 3d 251, 268 (Cal. Ct. App. 2011) ("[G]ang expert may . . . rely on the hearsay statements of gang members.").

The Federal Rules of Evidence permit an expert to rely on inadmissible hearsay evidence as long as the evidence is of the kind experts in the field regularly consult. FED. R. EVID. 703; *see United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (holding that police officer possessing years of experience and special knowledge of gangs may qualify as expert witnesses);

*see also United States v. Steed*, 548 F.3d 961, 976 n.13 (11th Cir. 2008) (noting that there exists

no Supreme Court precedent pertaining to expert witness' reliance on otherwise inadmissible

sources).  Likewise, the Constitution does not prevent an expert from relying on hearsay to form

his or her opinion.  *See United States v. Beltran–Rios*, 878 F.2d 1208, 1213 (9th Cir. 1989)

(stating that where a defendant is given ample opportunity to examine an expert whose opinion

is based in part on hearsay, no confrontation clause violation occurs).

      Based on the foregoing precedent, numerous federal courts have specifically held since

*Crawford* that the introduction of otherwise inadmissible evidence in support of the testimony of

a gang expert witness does not violate the Confrontation Clause.  *See, e.g.*, *United States v.*

*Palacios*, 677 F.3d 234, 243-44 (4th Cir. 2012); *Mundell v. Dean*, No. CV 11-7367, 2014 WL

7338819, at *6 (C.D. Cal. Dec. 22, 2014) ("[A] gang expert's reliance on hearsay evidence does

not violate the Confrontation Clause where the underlying hearsay is not admitted for the truth of

the matter asserted, but rather to explain the basis of the gang expert's opinion."); *Alejandre v.*

*Brazelton*, No. C 11–4803, 2013 WL 1729775, at *10-11 (N.D. Cal. April 22, 2013) (expert

witness' testimony concerning the meaning of defendant's tattoos based in part on hearsay

statements from undisclosed parolees did not violate Confrontation Clause); *Her v. Jacquez*, No.

2:09-cv-612, 2011 WL 1466868, at *33 (E.D.Cal. Apr. 18, 2011) (gang expert's testimony about

specific gangs and their activities and membership, based on information imparted to him by

others, did not violate Confrontation Clause because underlying information not offered for its

truth but merely to support expert's opinion); *Walker v. Clark*, No. CV 08–5587, 2010 WL

1643580, at *15 n. 8 (C.D. Cal. Feb. 18, 2010) (citing cases); *Lopez v. Jacquez*, No. 1:09-cv-

1451, 2010 WL 2650695, at *5 (E.D. Cal. July 1, 2010) ("[T]he Court does not find that an

objective application of *Crawford* would result in a finding that the gang expert's reliance on hearsay testimony to explain his opinion that Petitioner was a member of the West Fresno Nortenos, and that the West Fresno Nortenos area criminal street gang, to be in violation of Petitioner's Confrontation Clause rights.").

Under these guidelines and existing precedent, the Court does not find the state courts' rejection of Peters' confrontation claim unreasonable or contrary to Supreme Court authority. Detective Tribble's generalized testimony about the sources of his information about the North Vallejo Savages and other subset groups did not violate Peters' rights under the Confrontation Clause because it was not offered for the truth of the information asserted, but as a foundation for Detective Tribble's expert testimony regarding criminal street gangs. A review of the record indicates that whatever conversations Detective Tribble may have had with other persons, he did not testify at Peters' trial as to the truth of the statements made by those persons. Rather, any such statements were used by Detective Tribble merely to form the basis for his opinions. In this regard, the jury was specifically instructed that hearsay matters relied on by expert witnesses to form their opinions were not offered for the truth of those matters but were to be considered only in evaluating the basis of the expert's opinions. Further, as an expert, Detective Tribble could properly base his opinion on inadmissible evidence, including hearsay, of a kind that experts in the field regularly consult.

Moreover, even if the statements relied on by Detective Tribble in forming his opinion testimony could be considered testimonial in nature, their admission did not implicate Peters' right to confrontation. As the Fourth Circuit has explained:

> An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit

or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion" would provide an end run around *Crawford*. *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007). For this reason, an expert's use of testimonial hearsay is a matter of degree. *See* Ross Andrew Oliver, Note, *Testimonial Hearsay as the Basis for Expert Opinion: The Intersection of the Confrontation Clause and Federal Rule of Evidence After Crawford v. Washington*, 55 HASTINGS L.J. 1539, 1560 (2004) (describing a "continuum of situations" in which experts rely on testimonial hearsay). The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem. The expert's opinion will be an original product that can be tested through cross-examination.

*United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009); *see also United States v. Law*, 528 F.3d 888, 911-12 (D.C. Cir. 2008) (finding no Confrontation Clause violation based on admission of an expert's testimony because the expert did not simply convey statements by other declarants); *but cf. United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (noting that police expert's testimony explaining inadmissible evidence he relied upon in reaching his conclusion may implicate the Confrontation Clause as the expert simply transmitted hearsay to the jury).

Here, a review of the record indicates that Detective Tribble was not merely a transmitter of testimonial hearsay. Rather, as part of his job, he was required to learn about gang culture and activities. In this regard, he spoke to many people, including gang members, victims, and other criminal investigators. He offered an opinion of the relationship between gangs and the crimes committed by those gangs based on information he had gathered though those conversations and by his own investigation. Peters was given the opportunity to cross-examine Detective Tribble regarding his opinions as well as the basis thereof, and the jury was able to judge the credibility of Tribble's testimony in light of the sources he described in his testimony and upon which he relied.

For these reasons, the Court does not find unreasonable or contrary to clearly established federal law the state courts' conclusion that Detective Tribble's expert testimony, which relied in

part on conversations with undisclosed informants, did not violate Peters' rights under the

Confrontation Clause. Accordingly, Peters is not entitled to federal habeas relief on this ground.

Ground 3.     Denial of Petition for Disclosure of Juror Contact Information

Finally, Peters claims that the trial court violated his right to a fair trial and due process

when it denied his motion to release juror information. In considering this claim on direct

appeal, the Court of Appeal laid out the following facts:

> In support of the petition for disclosure in this case, Peters's counsel submitted a declaration alleging that the following facts were evidence of juror misconduct: (1) the jurors informed the court on the fourth day of deliberations that they had reached a verdict as to Coley but were at an impasse as to Peters, and continued deliberating after the foreperson indicated deliberations might be helpful; (2) when the jurors sent a note to the court asking whether witnesses Richard Eads and Francisco Soto were accomplices within the meaning of the jury instructions, the court responded that it was up to the jury to decide that question; (3) the jurors informed the court they were at an impasse "as to both cases" but sent a follow up note indicating that they were "close" and needed to know whether a unanimous verdict was required on the special allegations; (4) after being advised that unanimity was required, the jury returned verdicts that were "inconsistent," in that both appellants were convicted of second degree murder in a case where the evidence showed first degree murder, and no firearm enhancement was found true as to Peters, the alleged shooter; and (5) when the jury was polled, Juror No. 10 "hesitated noticeably" before responding.
>
> The court denied the petition: "I don't find that . . . the defendants have carried their burden to demonstrate a prima facie good cause basis to set a hearing and provide notification to the jurors. [¶] There are a couple [of] reasons. The basic thrust of the motion and even the argument something odd happened, this all concerns the jury's collective or individual thought processes or deliberative processes, and none of that is admissible under Evidence Code section 1150.[¶] The verdicts are not necessarily inconsistent. They may smack of compromise. It doesn't mean that anything odd happened. There is no suggestion of outside or undue influence. [¶] There is an indication that one of the jurors, Juror No. 10, hesitated when he was polled as to one of the verdicts. I think it was, if I read the motion correctly, the verdict as to Mr. Coley, not Mr. Peters. But there is no indication, other than that, that anything odd happened during the taking of the verdict. And juror hesitancy while polling is not uncommon. [¶] There is nothing to indicate that there were any equivocal statements made by Juror No. 10 before he or she indicated it was his verdict. And I just don't find that good cause has been shown as required by the statute."

*Peters*, 2013 WL 56988, at *11.

Under California law, a juror has an absolute right to refuse to discuss deliberations or the verdict with anyone, and juror identifying information in a criminal case must be sealed upon the recording of a jury's verdict, absent further order of the court. *See* CAL. CIV. PROC. CODE §§ 206(a), 237(b). A defendant may, however, petition the court for access to juror identifying information "necessary for the defendant to communicate with jurors for the purposes of developing a motion for new trial or any other lawful purpose." *Id.* § 206(g). The petitioner in such instance must make a *prima facie* showing of good cause for the release of juror information. *See id.* § 237(b); *see also People v. Santos*, 55 Cal. Rptr. 3d 1, 9 (Cal. 2007) (discussing showing required to release juror information).

Here, even assuming that the trial court erred in applying California's statutory law governing the unsealing of juror information, Peters is not entitled to relief as, again, federal habeas corpus relief "does not lie for errors of state law." *Lewis*, 497 U.S. at 780; *Estelle*, 502 U.S. at 68. Thus, to the extent Peters contends that the trial court erred in applying California's law regarding the unsealing of juror information, his claim is not cognizable on federal habeas review. And, indeed, there is no reason to believe that the state courts erred in applying California's law regarding the release of juror information. As the Court of Appeal explained:

> The trial court did not abuse its discretion when it concluded that appellants had failed to make the requisite showing of jury misconduct. Appellants suggest it was unusual for the jurors to have reached a verdict after declarations of impasse, but the sequence of events recited in defense counsel's declaration indicates only that the jurors carried out their duty to deliberate and that further deliberations were productive. Nor does a single juror's perceived hesitation in answering the court's post-verdict poll amount to evidence of misconduct during the deliberations; at most, it might suggest a subjective concern on the part of that juror that would not be admissible to challenge the verdict. (Evid.Code, § 1150, subd. (a).)
> We do not agree with appellants' suggestion that the jury's verdict of second degree murder rather than first degree murder is consistent with juror misconduct. Though the verdict was perhaps "puzzling" in light of the strong evidence that the

shooting was premeditated, it "may show no more than jury lenity, compromise, or mistake" (*People v. Abilez* (2007) 41 Cal.4th 472, 512–513), none of which amounts to misconduct and all of which involve the mental processes of the jurors, which are inadmissible to show misconduct.

We also reject appellants' claim that the verdicts on the firearm enhancements were inconsistent and therefore suggest impropriety on the part of the jury. It is true that the jury hung 11 to 1 in favor of the enhancement allegation as to Peters, the alleged shooter, but found the enhancement true as to Coley, the alleged driver. But this apparent discrepancy can be readily explained as the product of the particular instructions given.

Both appellants were alleged to have violated section 12022.53, which establishes escalating enhancements for the use of a firearm in the commission of enumerated offenses including murder and attempted murder: 10 years under subdivision (b) when the defendant "personally uses a firearm"; 20 years under subdivision (c) when the defendant "personally and intentionally discharges a firearm"; and 25 years to life under subdivision (d) when the defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice . . . ." Section 12022.53, subdivision (e)(1) additionally allows the enhancement to be imposed for vicarious firearm use in cases where the crimes are gang related: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22.[¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

Consistent with section 12022.53, subdivision (e)(1), CALCRIM No. 1402 advised the jury that it could find the enhancement true as to Coley if the gang allegation under section 186.22 was proved and "1. Someone who was a principal in the crime personally discharged a firearm during the commission of the crime; [¶] 2. That person intended to discharge the firearm; [¶] AND [¶] That person's act caused the death or great bodily injury of another person." But the jury was not given a similar instruction as to Peters, and instead received versions of CALCRIM Nos. 3148 and 3149 that required a finding that Peters personally discharged a firearm during the commission of the offenses.

Thus, assuming the holdout juror believed that both Coley and Peters were principals in the murder, but was unsure of the exact role played by each, that juror would have been obliged to reject the firearm allegation as to Peters under the instructions given, even though he or she could have returned a true finding as to Coley under a vicarious use theory. Far from showing juror misconduct, the verdicts on the firearm enhancements suggest the holdout juror gave close attention to the instructions given.

The court did not abuse its discretion when it concluded that appellants had failed to make a prima facie showing of good cause sufficient to support a reasonable belief that any juror committed misconduct. (*People v. Jones* (1998) 17 Cal.4th 279, 317.) The petition for disclosure was properly denied.

*Peters*, 2013 WL 56988, at *11-12.

Moreover, the United States Supreme Court has never recognized a constitutional right to have jury information unsealed after the jury reaches its verdict. To the contrary, the Supreme Court has refused to require intrusive inquiries into jurors' lives or deliberations even when evidence of misconduct exists. *See Tanner v. United States*, 483 U.S. 107, 128 (1987) (holding that lower court's refusal to conduct evidentiary hearing regarding juror's use of narcotics did not violate defendant's Sixth Amendment right to fair and impartial jury because other safeguards, such as voir dire and observations of fellow jurors, sufficiently protected defendant's right). In any event, because the Supreme Court has never recognized the right to have juror information unsealed, this Court does not find that the state courts' decision rejecting Peters' claim involved an unreasonable application of clearly established Supreme Court precedent. *See Carey*, 549 U.S. at 76.

Furthermore, Peters' underlying juror misconduct claim is foreclosed by clearly established Supreme Court law. As the Supreme Court has long held, juror testimony impeaching a verdict is inadmissible.[8] *Tanner*, 483 U.S. at 116-27 (discussing prohibition on jury testimony to impeach verdict). The only arguably relevant exception to the prohibition on using juror testimony to impeach a verdict is testimony involving the impact of extraneous information or matters on the jury's verdict. *See* FED. R. EVID. 606(b)(1);[9] *Mattox v. United*

---

[8]     The rationale for this rule is the protection of jury verdicts which "can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *Tanner v. United States*, 483 U.S. 107, 119-20 (1987) (citations omitted).

[9]     That rule provides:

*States*, 146 U.S. 140, 149 (1892) (testimony of jurors describing how they heard and read prejudicial information not admitted into evidence was admissible to impeach verdict because testimony involved extraneous influence on jury's verdict); *cf. Tanner*, 483 U.S. at 118 (post-verdict juror testimony regarding another juror's use of alcohol inadmissible to impeach verdict because testimony pertained to internal matters).[8]  Here, however, the purported instance of juror misconduct or irregularity does not involve the introduction of extraneous matters into the jury's deliberations.  Consequently, habeas relief is not warranted as to this claim.

---

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

FED. R. EVID. 606(b).

[8]  The Supreme Court recently recognized an exception to the no-impeachment rule "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant."  *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017).  No such statement was made in this case, and there was no evidence of racial, religious, or other prejudice.  The most that can be said is that the jury reach an inconsistent verdict, perhaps out of compassion for Peters.  However, "it is well-established that inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict."  *United States v. Suarez*, 682 F.3d 1214, 1218 (9th Cir. 2012) (citation, internal quotation marks and bracketing omitted).  Thus, while the jury's conviction for both defendants on second-degree murder may seem somewhat logically inconsistent with the evidence of a first-degree murder, particularly given that the jury found not true the firearm enhancement as to Peters, the alleged shooter, that alleged inconsistency is not grounds for habeas review because substantial evidence supports the jury's verdict.

## V. CONCLUSION AND ORDER

Peters is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court issues a Certificate of Appealability with respect to Peters' claim that there was insufficient evidence to sustain the jury's true finding on the gang allegation under Penal Code § 186.22(b)(1) (Ground 1), specifically, whether *People v. Sanchez*, 374 P.3d 320 (Cal. 2016) and *People v. Prunty*, 355 P.3d 480 (Cal. 2015) should be considered by this Court for purposes of deciding that claim, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979) and *Emery v. Clark*, 643 F.3d 1210,1215-16 (9th Cir. 2011), and Peters' claim that the trial court violated his right to confrontation by admitting gang expert testimony based in part on information from undisclosed informants (Ground 2). *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 7, 2017.

   /s/James K. Singleton, Jr.   
JAMES K. SINGLETON, JR.
Senior United States District Judge
